## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**DANIEL SANCHEZ,**

      **Plaintiff,**

**v.**                                                                **No. 22-cv-00234 JHR**

**KILOLO KIJAKAZI, Acting Commissioner**
**of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER DENYING BENEFITS

Before the Court is Plaintiff Daniel Sanchez's Motion to Reverse and Remand. [Doc. 30].

Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties consented

to Magistrate Jerry H. Ritter resolving Sanchez's challenge to the Commissioner's final decision

on his application for Social Security benefits and entering final judgment in this appeal. [Doc.

29].  Having reviewed the parties' briefing and the Administrative Record, the Court finds that

Sanchez's arguments do not warrant remand and therefore the Court will **DENY** Sanchez's Motion

and **AFFIRM** the Commissioner's final decision denying benefits under the Social Security Act.

### I.      BACKGROUND AND PROCEDURAL HISTORY

Sanchez protectively filed a Title II application for a period of disability and disability

insurance benefits and a Title XVI application for supplemental security income on August 16,

2019. AR at 10.  Sanchez alleged disability beginning March 1, 2017. *Id.*  In his application,

Sanchez alleged disability based on several ailments: diabetes, ruptured discs in his back, nerve

damage, and foot drop. AR at 75.  His claims were denied initially and upon reconsideration. AR

at 10.  After requesting a hearing, administrative law judge ("ALJ") Debra Boudreau held a

telephonic hearing on May 4, 2021, which Sanchez, his attorney, and an impartial vocational expert ("VE") attended. *Id.* The ALJ issued her decision finding Sanchez not disabled on July 29, 2021. AR at 22. Sanchez moved to reverse the Commissioner's decision [Doc. 30], the Commissioner responded [Doc. 36], and Sanchez replied [Doc. 37].

Sanchez worked in the oil fields prior to his present health issues. AR at 44-52. Sanchez initially suffered a fall at work resulting in a back injury in 2012. AR at 16. He fell again in 2018 and underwent surgery in February and March of 2018. AR at 16, 26. The February surgery involved L2-L4 decompression with instrumentation and the March surgery concerned L2-L5 revision and discectomies and posterolateral fusions. AR at 16. Sanchez was diagnosed with cauda equina syndrome from lumbar-associated nerve damage thereafter, which requires him to self-catheterize several times per day because he cannot urinate without a catheter. AR at 16, 56-7.

Sanchez testified that he goes to the restroom between thirty and forty times a day and he has trouble having bowel movements more than once or twice per week. AR at 16, 56-7. He has graduated from using a wheelchair and crutches to primarily using braces to walk. AR at 57. Sanchez reports that trying to walk without the braces is "a gamble" and that he wears ankle orthotics because of foot drop. AR at 16, 59. He also describes "shocking" pain in his feet at least twice a week or days at a time in cold weather. AR at 60. An MRI in August 2020 revealed nerve root impingement after surgical procedures. AR at 63. As far as medication, Sanchez reports taking thirty milligrams of Oxycodone four times per day. He also says he must lie down two to three times per day for around thirty minutes, largely to rest his knees and back because his ankles do not support his weight. AR at 64. Sanchez lives with his parents and alleges that he is essentially housebound because he is "constantly" using the bathroom or in pain. AR at 65.

## II.   THE COMMISSIONER'S FINAL DECISION

A claimant seeking disability benefits must establish that he is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The Administration must apply a five-step analysis to determine eligibility for benefits. 20 C.F.R. § 404.1520(a)(4).[1] The burden of proof remains with the claimant through step four of the analysis and shifts to the Commissioner at step five. *Nielson v. Sullivan,* 992 F.2d 1118, 1120 (10th Cir. 1993).

At step one of the sequential analysis, the ALJ found that that Sanchez had not engaged in substantial gainful employment since the alleged onset date of March 1, 2017. AR at 13. At step two, she found that Sanchez had two severe impairments, degenerative disc disease of the lumbar spine and obesity. *Id.* At step three, the ALJ determined that Sanchez's impairments, individually and in combination, did not meet or medically equal any impairment listed in Appendix 1 to C.F.R. Title 20, Part 404, Subpart P. AR at 13-14. She arrived at the step three determination by analyzing Sanchez's degenerative disc disease under Listing 1.15 for a variety of spinal disorders[2], none of which Sanchez has. AR at 14. She also considered that to meet Listing 1.15, Sanchez would need to demonstrate one of the listed spinal disorders "in conjunction with evidence of nerve root

---

[1] These steps are summarized in *Allman v. Colvin*, 813 F.3d 1326, 1333 n.1 (10th Cir. 2016). Regulations for determining whether a claimant is disabled for purposes of for both DIB and SSI are identical but are nonetheless codified in two separate parts of the Code of Federal Regulations. Part 404 of Title 20 governs DIB while Part 416 governs SSI. The Court cites only the applicable regulations in Part 404, but the analogous regulations in Part 416 apply as well.
[2] The listed disorders are herniated nucleus pulposus, spinal osteoarthritis (spondylosis), vertebral slippage (spondylolisthesis), degenerative disc disease, facet arthritis, or vertebral fracture or dislocation resulting in a compromise of the nerve root or spinal cord. AR at 14. One of these disorders must also be found in conjunction with evidence of nerve root compression characterized by limited upper extremity functioning or lumbar spine impairment with a positive straight leg raise test. AR at 14.

compression" characterized by one or more of the Listing's enumerated functional challenges. AR at 14. The ALJ noted that "these criteria must be present simultaneously, or within a close proximity of time, to satisfy the level of severity needed to meet this listing" and Sanchez "has not presented evidence of nerve root compression or other findings" to satisfy Listing 1.15. AR at 14. She also explained that Sanchez's obesity was not sufficiently severe for listing status but she accounted for it in the residual functional capacity. AR at 14.

When a claimant does not meet a listed impairment, the ALJ must determine the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e).  Residual functional capacity ("RFC") is a multidimensional description of the work-related abilities a claimant retains despite his impairments. 20 C.F.R. § 404.1545(a)(1).  It "does not represent the *least* an individual can do despite his or her limitations or restrictions, but the *most*."  SSR 96-8p at *Definition of RFC*. The ALJ determined that Sanchez could perform light work with the following limitations:

> [T]he undersigned finds that the claimant has the residual functional capacity to perform less than the full range of sedentary work . . . or work requiring lifting and/or carrying 10 pounds occasionally and less than 10 pounds frequently, standing and/or walking 2 hours in an 8-hour workday, and sitting about 6 hours in an 8-hour workday. The claimant could occasionally climb stairs and ramps; but should avoid climbing ladders, ropes, and scaffolds. He could frequently balance and stoop; occasionally kneel, crouch, and crawl. The claimant should avoid work at unprotected heights or in close proximity to large heavy moving machinery.

AR at 14. The ALJ reached this RFC after considering all of Plaintiff's symptoms and the consistency of those symptoms with all record evidence, medical or otherwise, as required by 20 C.F.R. §§ 404.1520c, 404.1529, and SSR 16-3p. AR at 14.  The ALJ followed the two-step process for assessing Sanchez's symptoms. AR at 15. The first step is determining whether an underlying medically determinable physical or mental impairment exists that could reasonably produce Sanchez's symptoms. *Id.* The second step is evaluation of the intensity and limiting effects of Sanchez's symptoms to determine the extent they limit his work-related activities. AR at 15.

In her RFC explanation, the ALJ recounted Sanchez's alleged inability to work because of a combination of impairments including his back and bathroom concerns. *Id.* She noted that Sanchez alleged his back pain "constantly" lands him in the hospital and makes it impossible to walk without his braces, which would cause blisters on his feet. *Id.* She also noted that Sanchez says he is "constantly" in the bathroom, around thirty to forty times per day, and must self-catheterize to urinate. AR at 15. The ALJ found that while Sanchez's impairments could produce the claimed symptoms, his allegations of intensity, persistence, and limiting effects were not entirely consistent with the medical and other evidence in the record. AR at 15.

The ALJ analyzed Sanchez's degenerative spinal disease and obesity under the rubric of SSR 16-3p to determine Sanchez's limitations. AR at 15. SSR 16-3p describes factors[3] to consider in assessing consistency of symptoms with evidence. AR at 15. She began with Sanchez's spine disease. AR at 16. The ALJ narrated the medical evidence showing that Sanchez suffered a "remote fall at work with a back injury in 2012" and a second fall in 2018 causing L2-L5 problems and surgeries therefore in February and March of 2018, with rehabilitation following. AR at 16. She observed that a post-surgery MRI showed L2-L5 spinal fusion with no hardware, fracture or loosening, and imaging later that year showing no acute osseous abnormality and an unchanged postsurgical lumbar spine. AR at 16. She considered that Sanchez then followed up with neurological consults and had significantly improved his walking by May 2019, although still self-catheterized. AR at 16. She documented that his upper extremity motor strength was normal,

---

[3] These factors are: (1) the claimant's activities of daily living, (2) the location, duration, frequency, and intensity of pain or other symptoms, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of medications taken to alleviate pain or other symptoms, (5) treatment, other than medication, for relief or pain or other symptoms, (6) any measures other than medication used to relieve pain or other symptoms, and (7) any other factors concerning function limitations and restrictions due to pain or other symptoms produced by medically determinable impairments, in order to assess the intensity, persistence, and limiting effects of the claimant's symptoms. AR at 15-16.

though he had no ankle motor strength. AR at 16. Halos appeared around the L5 screw, she noted, in April 2019. AR at 16.

The ALJ documented that Sanchez attended a physical consultative evaluation on February 29, 2020, the results of which "do not support [Sanchez's] allegations of disabling symptoms." AR at 16. She noted that Sanchez reported constant back pain, shooting pain, bladder catheterization, and walking with crutches. AR at 16. At the exam, however, he used only one crutch and ankle orthotics. AR at 16. The ALJ recounted Sanchez's examination results:

> [N]o acute physical distress in bilateral ankle orthotics and a right forearm crutch. While seated, he appeared comfortable and without pain. With movement, weakness in his ankles and spontaneous use of his crutch was observed consistently. He did appear uncomfortable with movements involving his low back, whether seated or in general. He did not arise spontaneously, and he used his crutch to arise from a seated position. He similarly used his crutch for most movements. He wavered and stumbled consistently.

AR at 16. Further, the ALJ considered Sanchez's normal cervical range of motion and no apparent discomfort; however, Sanchez had decreased range of lumbar spine motion when seated. AR at 16. Similarly noted were a negative straight leg raising test, normal range of motion in ankles, shoulders, elbows, and wrists, no spinal tenderness, normal muscle tone, and normal upper and lower extremity strength (except for ankles). AR at 17. Ankle sensation remained intact despite 0/5 strength. AR at 17. The ALJ then considered then chronic low back pain, diabetes, and obesity diagnoses from this evaluation. AR at 17.

Sanchez's emergency room visit in May 2020 for bilateral foot pain, for which he was given Toradol, was also documented. AR at 17. Similarly, the ALJ noted that Sanchez reported to pain management personnel that (narcotic) medication controlled his pain and received referrals for physical therapy and imaging. AR at 17. The August 2020 lumbar spine MRI revealed some herniation, nerve impingement with arthrosis, and foraminal encroachment. AR at 17. She

considered that Sanchez established with new pain management in October 2020 where he showed full range of motion and normal muscle strength in his extremities (though with antalgic gait) and signed a narcotic contact. AR at 17.  It was noted that pain continued as his biggest complaint in 2020; however, in 2021 he stated that medication controlled his pain such that he could manage his daily activities. AR at 17-18.

The ALJ thus determined that Sanchez's "complete treatment records do not document the limitations he subjectively alleges or otherwise establish functional limitations that would preclude the range of sedentary exertion" [sic] in the RFC. AR at 18. She reasoned that despite Sanchez's "extensive surgical history" and pain management with "significant narcotic medication," his ambulation progressed from wheelchair to crutch to, occasionally, without assistance. AR at 18. While his gait was antalgic, his muscle strength and tone were normal. AR at 18. Further, the ALJ noted that his neurological examination was normal, his pain was controlled, and his overall extremity range of motion and sensation were intact. AR at 18.

The ALJ also considered the prior administrative medical findings. She found the state agency consultants' opinions persuasive and "well supported as they indicate[] reduced standing and walking with additional postural and environmental limitations" due to Sanchez's lumbar spine decompression and fusion, antalgic gait, and bilateral foot drop. AR at 18. The ALJ also found the consultative evaluation[4] persuasive except for the limitation to use of a cane or occasional stooping. AR at 19. In rejecting the cane and occasional stooping limitation, the ALJ

---

[4] From his February 29, 2020, consultation, Dr. Lucas opined that Sanchez "was not limited in the ability to sit. He could stand and walk about 2 hours during an 8-hour day; and lift and/or carry 10 pounds occasionally; less than 5 pounds frequently. [Sanchez] could occasionally bend, stoop, squat, crouch, and crawl. He should not work at unprotected heights or use heavy machinery. He could occasionally use stairs. The claimant should use a cane." AR at 19.

reasoned that Sanchez showed improved sensation after surgery and eventually could walk unassisted. AR at 19.

The ALJ found nurse practitioner Jessica Roberts' opinion unpersuasive. Roberts opined that Sanchez could not work at a sedentary level, had restrictions in all functional areas, and would have to miss more than two workdays per month and lie down during the day. AR at 19. The ALJ found these limitations inconsistent with medical evidence and Sanchez's own accounts. AR at 19. The ALJ cited discrepancies between Ms. Roberts' limitations and specific treatment records concerning Sanchez's ability to handle/finger, lift/carry, and stand/walk. AR at 19. A common flaw in Roberts' opinions was the lack of "supportive clinical or objective findings." AR 20. In sum, the ALJ determined that Sanchez could perform work consistent with the RFC after considering the medical records, Sanchez's allegations and testimony, Social Security forms, medical opinions, and other evidence. AR at 20.

At step four, the ALJ found that Sanchez was unable to perform any past relevant work as a "roughneck." AR at 20. She explained that his past work required medium to heavy level exertion and thus was incompatible with the unskilled sedentary RFC, which the vocational expert verified. AR at 20.

At step five, the ALJ found that jobs exist in significant numbers in the national economy that Sanchez could perform given his age, education, work experience, and RFC. AR at 20. She relied on the vocational expert in determining that Sanchez could perform the requirements of the following occupations at the sedentary exertional level (SVP 2); touch-up screener (21,0000 jobs in the national economy), order clerk (19,000 jobs in the national economy), and charge account clerk (30,000 jobs in the national economy). AR at 21. The ALJ stated that no conflicts existed between the vocational expert's occupational evidence and the Dictionary of Occupational Titles

("DOT") or SSR 00-4p. AR at 21. She also noted that she is "obligated to only adopt those limitations and commensurate jobs as are consistent with the record considered in its entirety." AR at 21. Based on the above, the LJ found Sanchez not disabled. AR at 21.

## III.   STANDARD OF REVIEW

The Court "review[s] the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting *Mays v. Colvin*, 739 F.3d 569, 571 (10th Cir. 2014)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). The Commissioner's findings are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, requiring more than a scintilla but less than a preponderance. *See* 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007. The substantial evidence threshold "is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). A decision is not based on substantial evidence if it is overwhelmed by other record evidence. *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1175 (10th Cir. 2014). The Court's review is not *de novo* and the Court may not reweigh the evidence nor substitute its judgment for the agency's in making its ultimate determination. *Lax*, 489 F.3d at 1084. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* (internal citation omitted).

## IV.   ANALYSIS

Sanchez makes both legal error and substantial evidence arguments in hopes of remand. The legal arguments dispute the ALJ's step three finding that Sanchez did not meet or equal a

listing and urge that the ALJ should have applied the treating physician rule to Ms. Roberts' opinion. The substantial evidence arguments object to the ALJ not imposing specific limitations either for medication side effects or for cauda equina syndrome. Sanchez also challenges the frequent stooping RFC limitation. The Commissioner defends that more than substantial evidence exists to uphold the RFC and that the ALJ applied the proper step three listing and the current regulations concerning medical opinion evaluation. The Court has reviewed the record and affirms the decision denying benefits.

**A. Sanchez's listing argument does not warrant remand because the ALJ applied the proper listing in effect at the time Sanchez filed his application and any error is harmless.**

Sanchez argues that that ALJ committed legal error in her step three listing analysis regarding cauda equina syndrome. [Doc. 30-1, p. 26]. Sanchez states that "[e]ven though cauda equina syndrome starts in the spine, it is classified as a neurological disorder in the regulations" and thus regulations dictate the ALJ apply neurological disorder regulations (rather than musculoskeletal) to analyze cauda equina *Id.* at 27. Sanchez cites Listing 11.08A under neurological disorders to argue that he has demonstrated a complete loss of function for three months and is therefore disabled. *Id.* at 27. Sanchez argues in the alternative that Listing 11.08C requires finding that cauda equina precludes him from persisting or maintaining pace at work. *Id.* at 28. Sanchez protests that the ALJ has not discussed significantly probative evidence she rejected and so committed harmful error at step three. *Id.* at 28.

The Commissioner responds that the ALJ properly considered cauda equina syndrome under spine disorder Listing 1.00 which "specifically discusses issues with impact on the cauda equina nerve." [Doc. 36, p. 11]. The Commissioner cites Listing 1.16 outlining criteria for evaluating compromise of the cauda equina, including "bladder or bowel incontinence." *Id.* at 12.

The Commissioner contends that "[t]he need to self-catheterize is merely the need to insert a catheter during urination . . . [and] does not suggest any functional loss or the need for any workplace limitation." *Id.* at 13.  The Commissioner closes that the Listing cannot be met even if the ALJ erred because the record contains no evidence supporting Sanchez's loss of walking ability requiring the need for a two-handed walker, which the Listing requires.  *Id.* at 13-14.

Sanchez replies that the Commissioner uses *post-hoc* rationalization to justify the ALJ's finding. [Doc. 37, p. 2]. Sanchez emphasizes that the Commissioner's response relies upon Listing 1.16, which the ALJ did not cite (the ALJ applied Listing 1.15). *Id.*; AR at 14.

Despite some "curb appeal," Sanchez's argument fails. The relevant listing changed between the time Sanchez filed his application and the ALJ issued her decision. *Carson v. Comm'r of Soc. Sec.*, No. 1:21-CV-00004-EPG, 2022 WL 2954089, at *1 (E.D. Cal. July 26, 2022). "Effective April 2, 2021, Listing 1.04 was replaced by Listing 1.15, 'Disorders of the skeletal spine resulting in compromise of a nerve root(s),' and Listing 1.16, 'Lumbar spinal stenosis resulting in compromise of the cauda equina.'" *Id.* (citing 85 Fed. Reg. 78164-01; *Bailey v. Kijakazi*, CV 20-1163 KK, 2021 WL 5865614, at *9 n.9 (D.N.M. Dec. 10, 2021)). Courts have applied the listing effective on the date of the claimant's application because that date establishes benefits eligibility. *Id.* (citing *Maines v. Colvin*, 666 F. App'x 607, 608 (9th Cir. 2016); 42 U.S.C. § 1382(c)(7)). Listing 1.04 applies to Sanchez's case because he filed his application before April 2, 2021.

Former Listing 1.04 enumerated "disorders of the spine" including herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, and vertebral fracture.  https://www.ecfr.gov/on/2020-12-16/title-20/chapter-III/part-404#Appendix-1-to-Subpart-P-of-Part-404 (effective prior to April 2, 2021). In addition to a spinal disorder, Listing 1.04 "required compromise of a nerve root (including cauda equina) or the spinal

cord with [e]vidence of nerve root compression, [s]pinal arachnoiditis, or [l]umbar spinal stenosis." *Id.*; *Bailey*, 2021 WL 5865614, at *8 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04 (Apr. 1, 2020)). The revised listing separated Listing 1.04 into two listings: Listing 1.15 considering skeletal spine disorders resulting in nerve root compromise and Listing 1.16 considering compromise of the cauda equina from lumbar spinal stenosis. eCFR :: 20 CFR Part 404 (Aug. 22, 2023) -- Federal Old-Age, Survivors and Disability Insurance (1950– ) (current version effective after April 2, 2021).

Regardless of which listing version applies, Listing 11.08 under neurological disorders does not address cauda equina syndrome. As described above, cauda equina syndrome is named in both Listing 1.04 and Listing 1.16, but nowhere in Listing 11.08 (and Sanchez provides no contrary information). The Court will adhere to the plain language doctrine to infer that Listing 11.08 does not apply here. *See Bd. of Educ. of Gallup-McKinley Cnty. Sch. v. Native Am. Disability L. Ctr., Inc.*, 959 F.3d 1011, 1013 (10th Cir. 2020) (plain language of regulation has primacy). Listing 1.04 was properly applied to Sanchez's case during the administrative proceedings, which occurred prior to the Listing change. *See* AR at 79, 89. The ALJ issued her decision after the listing change and cited current Listing 1.15. AR at 22. While she cited the current Listing 1.15, the substance of her analysis indicates that she applied Listing 1.04:

> The claimant's degenerative disc disease does not meet listing *1.15 because he does not have one of the listed disorders* (herniated nucleus pulposus, spinal osteoarthritis (spondylosis), vertebral slippage (spondylolisthesis), degenerative disc disease, facet arthritis, or vertebral fracture or dislocation resulting in a compromise of the nerve root or spinal cord) ***in conjunction with*** (sic) *evidence of nerve root compression characterized by one or more of the following* (a) limited functioning of the associated upper extremity, with physical examination reproducing the related symptoms based on radicular signs and clinical tests appropriate to the specific cervical nerve room (for example, a positive Spurling test); or (b) limited functioning of both upper extremities; or (c) in connection with the lumbar spine impairment, also a positive straight leg raising test . . . in both

> supine and sitting positions appropriate to the specific lumbar nerve root that is
> compromised, which results in the inability to effectively ambulate.

AR at 14 (emphasis added). The ALJ's conjunctive language required a listed disorder "in

conjunction with" nerve root compression shown by a positive Spurling test, limited upper

extremity function, or a positive straight leg test resulting in inability to walk, a formulation which

aligns with Listing 1.04 rather than current Listings 1.15 and 1.16. AR at 14; *see*

https://www.ecfr.gov/on/2020-12-16/title-20/chapter-III/part-404#Appendix-1-to-Subpart-P-of-

Part-404.

     The Court thus finds that the ALJ did not err in her step three Listing assessment. It would

appear the ALJ properly applied Listing 1.04 in substance because Sanchez filed his application

for benefits on August 16, 2019, prior to the Listing change. *See Carson*, 2022 WL 2954089, at

*1 n.1; AR at 10. The Court treats the ALJ's naming of Listing 1.15 as a typographical error not

fatal to the decision. *See Ramsey v. Barnhart,* 117 F. App'x 638, 641 (10th Cir. 2004). However,

even if viewed as a substantive rather than typographical error, the error is still harmless[5] because

Sanchez does not meet the revised Listing 1.16, as the Commissioner explains. [Doc. 36, p. 11-

13]. The Commissioner argues that Listing 1.16 cannot be met because "the record contains no

---

[5] The fact that the ALJ analyzed Sanchez's cauda equina in her RFC analysis also renders any step three error harmless. Courts have held that an ALJ's RFC analysis and findings which preclude finding that the claimant's impairments meet or equal a listing rendering failure to consider a listed impairment at step three harmless. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005) (finding harmless error where the ALJ's RFC findings "reject any notion that claimant suffers from persistent disorganization of motor functions in two extremities" required for presumptive disability at step three); *Bland v. Astrue*, No. 09-1254-SAC, 2010 WL 3168204, at *5 (D. Kan. Aug. 10, 2010), aff'd, 432 F. App'x 719 (10th Cir. 2011) (finding harmless error where the ALJ discussed the claimant's psychological and IQ assessments in the RFC despite not considering the proper listing at step three). The same is true here. The ALJ's RFC findings supporting sedentary light work negate any inference that a step three listing rendered Sanchez disabled, and thus any step three error in this regard is harmless.

evidence that would support the requisite loss of ability to ambulate" under that Listing. *Id.* at 13-14. The Court has reviewed Listing 1.16 and agrees. Sanchez has not shown that his cauda equina meets or equals either Listing 1.04 or Listing. 1.16 and thus his argument fails.

**B. Sanchez's arguments attacking the RFC do not warrant remand because substantial evidence support the RFC and the ALJ applied the correct legal standards.**

Sanchez makes several arguments attacking the RFC. First, Sanchez asserts that the ALJ failed to impose a limitation for his off-task time. [Doc. 30-1, p. 20]. Under this argument, Sanchez contends that the ALJ failed to consider narcotic side effects and cauda equina syndrome under SSR 16-3p. *Id.* at 29, 30. Second, Sanchez argues that the ALJ erred in finding Ms. Roberts' opinion unpersuasive. *Id.* at 31. He also maintains that the ALJ erred in finding that he could frequently stoop. *Id.* at 33.

The Commissioner responds that the ALJ's functional ability findings are well-supported by substantial evidence. [Doc. 36, p. 14]. Regarding Ms. Roberts, the Commissioner urges that substantial evidence and the new regulations render her opinion unpersuasive. *Id.* at 16. Regarding cauda equina, the Commissioner maintains that Sanchez's subjective symptoms do not preclude substantial evidence from supporting his functional abilities. *Id.* at 26. Regarding stooping, the Commissioner contends that substantial evidence supports the frequent stooping limitation. *Id.* at 28. Overall, the Commissioner characterizes Sanchez's RFC arguments as de facto invitations to reweigh the evidence. *Cook v. Barnhart*, 62 F. App'x 290, 292 (10th Cir. 2003). The Court is not persuaded that any of Sanchez's points of alleged error have merit.

1. Cauda Equina

The Court finds no error in the lack of a specific RFC limitation for the time Sanchez alleges being off task due to cauda equina. Sanchez invokes SSR16-8p in support. [Doc. 30-1, p.

29]. The Court is unable to locate SSR 16-8p[6]; however, Sanchez also points the Court to regulatory guidance on how to evaluate symptoms, including pain. *Id.* (citing 20 C.F.R. § 404.1529(c)(3)). That regulation generally directs the ALJ to consider all symptoms including pain "and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence" considering the claimant's statements on symptoms and pain. 20 C.F.R. § 404.1529(a). The ALJ ultimately "determine[s] the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can be reasonably be accepted as consistent with the medical signs and other evidence to decide how [the claimant's] symptoms affect [the] ability to work." *Id.* The subsection Sanchez cites provides in relevant part:

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, *which can reasonably be accepted as consistent with the objective medical evidence and other evidence*, will be taken into account . . . in reaching a conclusion as to whether you are disabled.

20 C.F.R. § 404.1529(c)(3) (emphasis added).

Sanchez contends that the ALJ erred in not imposing an RFC limitation due to off-task time from his dysfunctional bladder and bowels. [Doc. 30-1, p. 29]. However, he fails to make substantive argument connecting these ailments to the above law. Sanchez states that he has to self-catheterize six times per day to urinate. *Id.* He cites his hearing testimony that he has to go to the restroom thirty to forty times per day, requires assistance up the stairs to the bathroom, cannot urinate without a catheter, and cannot leave the house alone. [Doc. 30-1, p. 29, 30]. The most

---

[6] The Court infers that Sanchez intended to invoke SSR 16-3p given that he cites it in his later argument on medication side effects. *See* [Doc. 30-1, p. 30]. As explained below, Sanchez's argument is unpersuasive because the ALJ did in fact cite SSR 16-3p concerning how to evaluate the consistency of symptoms with the medical evidence. AR at 15. The ALJ applied SSR 16-3p to Sanchez's symptoms, including cauda equina, and explained that the medical records to not align with his complaints. AR at 15-18. The Court finds no error.

competent evidence Sanchez cites is Ms. Roberts' notation that the cauda equina syndrome was "unstable and uncontrolled" at one point. *Id.*

These conclusory allegations fail to address a key component of § 404.1529(c)(3), that the disability decision will account for such evidence to the extent it "can reasonably be accepted as consistent with the objective medical evidence and other evidence." § 404.1529(c)(3). Sanchez does not explain how his subjective statements of bladder and bowel function are reasonably consistent with the objective medical evidence (and other evidence) such that they should be accounted for in the ALJ's disability decision. For example, he does not point to a medical record showing that he must go to the bathroom thirty to forty times per day. Nor does he cite any urology nor neurology records consistently establishing significant impediments related to self-catheterization and bowel stimulation.

Meanwhile, the ALJ's decision accounted for Sanchez's cauda equina. The ALJ's duty is not to impose a limitation for every symptom nor discuss all evidence; rather, she must consider all evidence. *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). Further "courts take the ALJ at [her] word where the ALJ indicates [she] has considered all the evidence." *Rogers v. Colvin*, No. CIV-12-421-C, 2013 WL 2257128, at *1 (W.D. Okla. May 22, 2013) (citing *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir.2009) (internal citation omitted)). She considered Sanchez's hearing testimony that he "has to self-catheterize and [] is usually in the restroom 30 to 40 times a day." AR at 15. Directly after, the ALJ found that Sanchez's narration of his symptoms' alleged intensity and limiting effects was inconsistent with the medical evidence. AR at 15. She then discussed the medical evidence and evaluated the symptoms under SSR 16-3p, including his daily self-catheterization, physical exams, and imaging results. AR at 15-16 (discussing catheter three

times). The ALJ did not overlook Sanchez's concerns. Sanchez's argument on review does not convince this Court of error necessitating remand.

    2.  <u>Medication Side Effects</u>

The Court finds no error in the lack of a specific RFC limitation for the time Sanchez alleges being off task due to medication side effects. Sanchez makes the same argument here as with cauda equina, that the ALJ must consider the medication side effects and other pain treatment under SSR 16-3p and 20 CFR § 404.1529(c). [Doc. 30-1, p. 16]. Sanchez argues that narcotic pain medications make him drowsy or dizzy such that he must recline up to three times per day for thirty minutes. *Id.* He says the off-task time from medication side effects is "significantly probative evidence [the ALJ] reject[ed]" and results in error. *Id.* (citing *Clifton*, 79 F.3d 1010). Sanchez also inserts a quotation regarding grids that the Court views as inapplicable. *Id.*

This RFC assault also fails because the ALJ considered Sanchez's pain medication and its effects in her RFC analysis. The ALJ considered SSR 16-3p's instruction to analyze Sanchez's reported symptoms, including, "the type, dosage, effectiveness, and side effects of medications taken to alleviate pain or other symptoms" and "treatment, other than medication, for relief of pain or other symptoms." AR at 15. The ALJ accordingly discussed Sanchez's "significant" narcotic medication, ongoing pain management, narcotics contract, emergency room visits when he needed pain medication, and "extensive" underlying surgical history. AR at 17-18. She also assessed Sanchez's ability to drive himself to the emergency room, lack of neurological deficits, steady (though antalgic) gait, report that "medication was controlling his pain and that he was able to complete his daily activities on his regimen (Exhibit B14F/40)," and lack of numbness, tingling, or weakness. AR at 18. Moreover, the RFC accounts for side effects by prohibiting Sanchez from working at unprotected heights or in close proximity to heavy moving machinery. *See* AR at 14.

After consideration, the Court finds that substantial evidence supports the RFC relating to side effects. The ALJ considered testimonial and medical evidence of Sanchez's narcotics use and incorporated appropriate RFC limitations. The Court will not reweigh evidence to yield a different outcome. *Cook*, 62 F. App'x at 292. Therefore, the Court finds no error warranting remand.

3.   Frequent Stooping

Sanchez also disputes the RFC limitation to frequent stooping. [Doc. 30-1, p. 33]. Sanchez points to hearing testimony that he could bend over only to pick up a piece of paper and primary care documentation of difficulty bending forward. *Id.*  Sanchez criticizes the ALJ's reliance on records showing he had good post-surgery results with improved sensation and could ambulate unassisted. *Id.* He contends that the ALJ erred in failing to discuss the evidence "which supports a finding that Mr. Sanchez does not have the ability to stoop" and thus would restrict the type of work available to Sanchez.

The Commissioner defends that substantial evidence supports the frequent stooping limitation because the ALJ explained her decision with record evidence and rationalized why she rejected the consultative examiner's opinion. [Doc. 36, p. 28]. The Commissioner urges that Sanchez mischaracterized the appropriate legal standard which requires the ALJ to consider (not discuss) all the evidence; in effect, Sanchez invites the Court to reweigh the evidence. *Id.*  Finally, the Commissioner notes that the stooping issue is moot regardless because none of the occupations the vocational expert identified require stooping. *Id.*  at 29.

The Court agrees with the Commissioner that substantial evidence supports the stooping limitation, and that even if error occurred, it is harmless. The ALJ properly discussed her basis for rejecting consultative examiner Dr. Lucas's occasional stooping opinion: "[a]s discussed above, the claimant demonstrated good results following this surgery, with improved sensation noted

(Exhibit B9F/6), and later records documented that the claimant was able to ambulate unassisted (Exhibit B15F/10, B14F/40)." AR at 19. An administrative level RFC also found frequent stooping. AR at 81. Sanchez's disagreement with the outcome or quality of analysis does not equate error. The Court will not reweigh the evidence. Further, the Court is persuaded by the fact that the DOT codes of the step five jobs[7] clarify that stooping is "not present-activity or condition does not exist." [Doc. 36, p. 29] (citing *Lane v. Colvin*, 643 F. App'x 766, 770 (10th Cir. 2016)).

### C. The ALJ applied the correct legal standards in finding Ms. Roberts' opinion unpersuasive and substantial evidence supports that finding.

Sanchez further challenges the RFC by arguing that the ALJ erred in finding Ms. Roberts' opinion unpersuasive. [Doc. 30-1, p. 30, 31]. Sanchez highlights the portion of Ms. Roberts' opinion stating that he would miss more than two days of work per month. *Id.* at 31. He also cites

---

[7] The vocational expert identified and the ALJ included at step five the following occupations: **(1)** TITLE(s): TOUCH-UP SCREENER, PRINTED CIRCUIT BOARD ASSEMBLY (electron. comp.) Inspects printed circuit board (PCB) assemblies for defects, such as missing or damaged components, loose connections, or defective solder: Examines PCB's under magnification lamp and compares boards to sample board to detect defects. Labels defects requiring extensive repairs, such as missing or misaligned parts, damaged components, and loose connections, and routes boards to repairer. Performs minor repairs, such as cleaning boards with freon to remove solder flux; trimming long leads, using wire cutter; removing excess solder from solder points (connections), using suction bulb or solder wick and soldering iron; or resoldering connections on PCB's where solder is insufficient. Maintains record of defects and repairs to indicate recurring production problems. May reposition and solder misaligned components. May measure clearances between board and connectors, using gauges. GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 2 DLU: 86. https://occupationalinfo.org/72/726684110.html; **(2)** TITLE(s): ORDER CLERK, FOOD AND BEVERAGE (hotel & rest.) Takes food and beverage orders over telephone or intercom system and records order on ticket: Records order and time received on ticket to ensure prompt service, using time-stamping device. Suggests menu items, and substitutions for items not available, and answers questions regarding food or service. Distributes order tickets or calls out order to kitchen employees. May collect charge vouchers and cash for service and keep record of transactions. May be designated according to type of order handled as Telephone-Order Clerk, Drive-In (hotel & rest.); Telephone-Order Clerk, Room Service (hotel & rest.). GOE: 07.04.02 STRENGTH: S GED: R3 M1 L2 SVP: 2 DLU: 77; https://occupationalinfo.org/20/209567014.html; **(3)** TITLE(s): CHARGE-ACCOUNT CLERK (clerical) alternate titles: credit-card interviewer; new-account interviewer Interviews customers applying for charge accounts: Confers with customer to explain type of charge plans available. Assists customer in filling out application or completes application for customer. Reviews applications received by mail. Files credit applications after credit department approves or disapproves credit. May check references by phone or form letter and notify customer of acceptance or rejection of credit [CREDIT CLERK (clerical)]. May verify entries and correct errors on charge accounts [CUSTOMER-COMPLAINT CLERK (clerical)], using adding machine. May answer credit rating requests from banks and credit bureaus. May issue temporary shopping slip when credit references appear satisfactory. GOE: 07.04.01 STRENGTH: S GED: R3 M2 L3 SVP: 2 DLU: 77. https://occupationalinfo.org/20/205367014.html.

his MRI findings and the "controlling statute" instructing an ALJ to consider established medical evidence in deciding disability. *Id.* (citing 42 U.S.C. § 423(d)(5)(A)). He further complains that the ALJ failed to analyze his "extremely limited" daily activities and disputes their use as evidence supporting his ability to do sedentary work. *Id.* at 32. He finally criticizes the ALJ's use of the fact that medication controlled his pain as evidence to discount Ms. Roberts' opinion. *Id.* He instead points to instances where he went to the emergency room for pain. *Id.* at 33.

The Court finds that the ALJ did not err in finding Ms. Roberts' opinion unpersuasive. The ALJ thoroughly analyzed Roberts' opinion before she rejected it:

> The limitations noted by Ms. Roberts are not consistent with the claimant's treatment notes or with the claimant's own reports. For example, while Ms. Roberts opined that the claimant could only use his hands on a frequent basis, she performed no objective testing or offered a correlating diagnosis to support these noted manipulative limitations. His treatment notes consistently document 5/5 upper extremity strength and 5/5 bilateral grip strength (Exhibit B14F/7, 12, 17, 22, 32, 37, 42). The claimant has not reported any difficulty using his hands or with range of motion of the upper extremities. He reported on his Function Report that he was able to fold clothes, vacuum, sweep, mop, and prepare food (Exhibit B4E), which suggests an ability to perform manipulative functions.
>
> Regarding the claimant's reduced ability to lift/carry and stand/walk, his treatment records do support this reduction. As discussed above, his gait has been described as antalgic, but his muscle strength and tone is consistently normal (Exhibit B14F/7, 12, 17, 22, 27, 32, 27, 42). This portion of the opinion is deemed persuasive, as his treatment notes from Ms. Roberts do support a sedentary ability. However, the portion of the opinion regarding absences is not supported, as the claimant reported that his medications were controlling his pain and he was able to complete his daily activities. (Exhibit B14F/30). Although Ms. Roberts references the claimant's imaging and she stated that the claimant sought specialty treatment, she did not identify supportive clinical objective findings when offering her opinion. Overall, her treatment records support a finding that the claimant can perform sedentary exertion.

AR at 19-20.

The ALJ evaluated Ms. Roberts' opinion under regulations for claims filed after March 27, 2017, which direct that no deference nor specific evidentiary weight is given to any prior medical findings, including those from treating physicians. §404.1520c(a). Supportability and consistency

are the most important factors the ALJ considered in evaluating Ms. Roberts' opinion. *See id.*  For example, ALJ assessed supportability when she determined that Ms. Roberts "did not identify supportive clinical or objective findings when offering her opinion" and consistency when she concluded Roberts' limitations "are not consistent with the claimant's treatment notes or with the claimant's own reports." AR at 20; *see* §404.1520c(a). The ALJ thus followed the proper applicable legal standard to conclude that Ms. Robert's opinion is not persuasive. The Court will not reweigh Sanchez's daily activities[8] to reach a different result. *See* [Doc. 30-1, p. 31, 32].

The Court is not persuaded by Sanchez's argument that the ALJ erred when she did not apply the treating physician rule even though Sanchez's application was filed after the new regulations took effect.  *See* [Doc. 30-1, p. 16-36] (arguing in favor of treating physician rule application); AR at 10 (reflecting August 19, 2019, as Sanchez's filing date); § 404.1520c (providing that "for claims filed . . . on or after March 27, 2017, the rules in this section apply" which do not give deference to a claimant's treating physicians' opinion). Sanchez argues primarily that the regulations abolishing the treating physician rule violate 5 U.S.C. § 706(2)(A) and alternatively that the Tenth Circuit's pre-1991 treating physician rule applies even after March

---

[8] Sanchez posits that the ALJ improperly used Sanchez's daily activities to discount his "disabling pain" based on "sporadic activities that are limited in exertion and duration." [Doc. 30-1, p. 18]. Sanchez cites *Broadbent v. Harris*, 698 F.2d 407 (10th Cir. 1983) in support. *Id*. *Broadbent* stated that daily activities do not establish "without more evidence, that a person is able to engage in a 'substantial gainful activity.' They may be considered, along with medical testimony, in the determination of whether a party is entitled to disability benefits." *Id.*  at 413. Sanchez's argument in this regard is not well-taken. The ALJ did not use Sanchez's daily activities alone to discount his symptoms. Rather, the ALJ cited other medical and treatment evidence in the record. AR at 19, 20. That case also made clear that, concerning subjective pain complaints, "the determination of credibility is left to the observations made by the Administrative Law Judge as the trier of fact. His determinations on this issue are generally considered binding on the reviewing court." *Id.*  The Court will defer to the ALJ's credibility assessment of Sanchez as well.

27, 2017. [Doc. 30-1, p. 16-25]. The Commissioner asserts this view is incorrect and the Court agrees with the Commissioner. [Doc. 36, p. 16].

This Court joins other courts in rejecting the attempted revival of the treating physician rule. A District of Colorado opinion, concluding that "[t]his suggestion does not withstand closer scrutiny," cited a litany of courts similarly rejecting the argument. *Bess v. Kijakazi*, No. 22-CV-00864-REB, 2023 WL 2422205, at *3 (D. Colo. Mar. 6, 2023) (citing *Harner v. Social Security Administration, Commissioner*, 38 F.4th 892, 897 (11th Cir. 2022); *Tucker v. Kijakazi*, 2022 WL 18032978 at *15 n.29 (D. Mass. Sept. 30, 2022); *Katherine P. v. Kijakazi*, 2022 WL 3224851 at *6 (D.R.I. Aug. 10, 2022); *Lopez v. Kijakazi*, 2021 WL 6064419 at *3-5 (E.D. Cal. Dec. 12, 2021); *Tasha W. v. Commissioner of Social Security*, 2021 WL 2952867 at *6 (N.D.N.Y. July 14, 2021); *Dany Z. v. Saul*, 531 F.Supp. 3d 871, 883 (D. Vt. March 31, 2021); *Kevin M. v. Commissioner of Social Security*, 2020 WL 13501276 at *2-5 (W.D. Wash. Feb. 14, 2020), *adopted*, 2020 WL 1139765 (W. D. Wash., March 09, 2020)).

In rejecting counsel's claimed hours for his opening brief largely on this topic, the court noted "counsel should have known that this argument's chance of success was vanishingly small and did not warrant significant expenditure of time." *Id.* Although *Bess* considered the treating physician argument in the fee context, this Court agrees in substance: the treating physician rule is long-supplanted by new regulations. The ALJ's evaluation of Ms. Roberts' opinion stands.

## V.   CONCLUSION AND ORDER

For the reasons state above and after reviewing the record, the Court finds that the ALJ's decision is supported by substantial evidence and applied the proper legal standards. The ALJ did not err in her step three listing analysis or her evaluation of medical opinions and she supported her RFC determinations with substantial evidence. She considered all the evidence in her decision

to deny disability at step five. The Court may not "displace the agency's choice between two fairly conflicting views, even [if] the court would justifiably have made a different choice had the matter been before it de novo." *Lax*, 489 F.3d at 1084. The Court will affirm the ALJ's decision.

**IT IS THEREFORE ORDERED** that Plaintiff Daniel Sanchez Motion to Reverse and Remand, [Doc. 30], is **DENIED** and the Commissioner's Final Decision in this case is **AFFIRMED.**

**JERRY H. RITTER**
**U.S. MAGISTRATE JUDGE**
**PRESIDING BY CONSENT**